# No. 22-51062

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JEROSWASKI WAYNE COLLETTE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Western District of Texas

———————

**Brief of Defendant-Appellant**

———————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

BRADFORD W. BOGAN
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## Certificate of Interested Persons

### UNITED STATES v. JEROSWASKI WAYNE COLLETTE, No. 22-51062

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Jeroswaski Wayne Collette,** Defendant-Appellant;

2. **Jaime Esparza,** U.S. Attorney

3. **Ashley C. Hoff,** former U.S. Attorney;

4. **Monica L. Daniels, Jason Dewey, John A. Fedock, Martha Lopez, Joseph Mahoney,** and **Brandi Young,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Anthony J. Colton** and **John J. Velasquez,** Assistant Federal Public Defenders, who represented Defendant-Appellant in the district court; and

7. **Bradford W. Bogan,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Bradford W. Bogan
BRADFORD W. BOGAN
*Attorney for Defendant-Appellant*

## Statement Regarding Oral Argument

Collette raises two challenges to his conviction of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1): a Second Amendment challenge and a Commerce Clause challenge. Although the second of these issues is foreclosed by this Court's precedent, the first issue would benefit from oral argument because it involves an intervening Supreme Court decision—*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)— that abrogates this Court's precedent.

# Table of Contents

Certificate of Interested Persons.......................................................... i

Statement Regarding Oral Argument............................................... iii

Table of Authorities......................................................................... vi

Subject Matter and Appellate Jurisdiction ..................................... 1

Issues Presented for Review............................................................ 2

Statement of the Case...................................................................... 3

Summary of the Arguments ............................................................ 10

Arguments and Authorities............................................................. 12

I.  18 U.S.C. § 922(g)(1) violates the Second Amendment because firearm possession is protected by the plain text of the Amendment, and the Government cannot show a historical tradition of categorically disarming felons.............. 12

   A. Standard of review. ............................................................ 13

   B. Bruen abrogated the Second Amendment framework previously employed by circuit courts after *Heller*. ........... 13

      1. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1): possession of a firearm. ........................................................................ 15

      2. Felons are among "the people" protected by the Second Amendment. ...................................................... 17

      3. The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation.".................................................... 21

II. 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress' power to regulate interstate and foreign commerce; alternatively, it should be construed to require a

closer connection to interstate commerce than alleged or admitted in this case. .............................................................. 43

A. Standard of review. ............................................................ 43

B. 18 U.S.C. § 922(g)(1) exceeds Congress' power to regulate interstate and foreign commerce. ........................ 43

Conclusion.................................................................................... 50

Certificate of Compliance with Type-Volume Limit..................... 51

# Table of Authorities

## Cases

*Alderman v. United States,*
  562 U.S. 1163 (2011)................................................................. 45

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ...........................................................*passim*

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ...................................................... 14

*In re Bonvillian Marine Serv., Inc.,*
  19 F.4th 787 (5th Cir. 2011)........................................................ 13

*Industrial Union Dept., AFL-CIO v.*
  *American Petroleum Institute,*
  448 U.S. 607 (1980) ................................................................. 46

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ................................................*passim*

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ...........................................................*passim*

*Medina v. Whitaker,*
  913 F.3d 152 (D.C. Cir. 2019) ........................................ 35, 38, 39

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ...................................................... 46, 47, 48

*Nat'l Rifle Ass'n of Am., Inc. v.*
  *Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  700 F.3d 185 (5th Cir. 2012) ................................................ 14, 35

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022).........................................................*passim*

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014) ................................................................. 25

*Scarborough v. United States,*
  431 U.S. 563 (1977) ..........................................................*passim*

*United States v. Alcantar,*
  733 F.3d 143 (5th Cir. 2013) ................................................ 44, 49

*United States v. Booker,*
  644 F.3d 12 (1st Cir. 2011).................................................... 34, 35

*United States v. Hill,*
  927 F.3d 188 (4th Cir. 2019) ...................................................... 45

*United States v. Knowles,*
  29 F.3d 947 (5th Cir. 1994) ........................................................ 43

*United States v. Kuban,*
  94 F.3d 971 (5th Cir. 1996) ........................................................ 45

*United States v. Lopez,*
  514 U.S. 549 (1995) ........................................................ 44, 45, 49

*United States v. McGinnis,*
  956 F.3d 747 (5th Cir. 2020) ...................................................... 14

*United States v. Morrison,*
  529 U.S. 598 (2000) .................................................................. 49

*United States v. Rahimi,*
  61 F.4th 443 (5th Cir. 2023) ................................................*passim*

*United States v. Riley,*
  No. 1:22-cr-163 (RDA), 2022 WL 7610264
  (E.D. Va. Oct. 13, 2022) ........................................................... 19

*United States v. Seekins,*
  52 F.4th 988 (5th Cir. 2022) ................................................ 44, 45

*United States v. Seekins,*
  No. 21-10556, 2022 WL 3644185
  (5th Cir. Aug. 24, 2022) (per curiam) (unpublished).................. 43

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ...................................................... 36

*United States v. Toure*,
   965 F.3d 393 (5th Cir. 2020) ...................................................... 43

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) .................................................................. 18

*United States v. Williams*,
   616 F.3d 685 (7th Cir. 2010) ...................................................... 35

## Constitutional Provisions

U.S. Const. art. I, § 8, cl.3 .................................................... 3, 43, 47

U.S. Const. amend. I .............................................................. 17, 18

U.S. Const. amend. II .............................................................*passim*

U.S. Const. amend. IV .............................................................. 17, 18

U.S. Const. amend. IX .................................................................. 17

U.S. Const. amend. XIV.............................................................. 22, 23

## Statutes

18 U.S.C. § 922.......................................................................... 35

18 U.S.C. § 922(g) ................................................................... 7, 24

18 U.S.C. § 922(g)(1) ...........................................................*passim*

18 U.S.C. § 922(g)(8) ........................................................ 20, 29, 42

18 U.S.C. § 924(a)(2) ................................................................... 7

18 U.S.C. § 924(a)(8) ................................................................... 7

18 U.S.C. § 3231.......................................................................... 1

18 U.S.C. § 3742(a) ............................................................... 1

28 U.S.C. § 1291 .................................................................... 1

1671 Game Act .................................................................... 27

Act of May 8, 1792,
 1 Stat. 271 ....................................................................... 33

Act of Oct. 3, 1961,
 Pub. L. No. 87-342, 75 Stat. 757 ................................... 31

Bipartisan Safer Communities Act,
 Pub. L. 117-159, § 12004(c)(1), (2), 136 Stat. 1313 ...................... 7

Constitution and Laws of the State of New-Hampshire,
 Act of Dec. 28, 1792 (1805) ........................................... 33

Federal Firearms Act of 1938,
 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250 ....................... 31

Gun Control Act of 1968,
 Pub. L. 90-618, 82 Stat. 1213 ....................................... 31

Herty, Digest of the Laws of Maryland,
 "Militia," §§ 7, 15, 19, 20 (1799) ................................... 33

Laws of the State of Delaware,
 ch. XXXVI, §§ 1, 2, 4 (1797) ......................................... 33

Marbury, Digest of the Laws of the State of Georgia,
 Act of December 24, 1792, §§ 9–10 (1802) ................... 33

Militia Act of 1662 ............................................................ 27

Mitchell, Statutes at Large of Pennsylvania,
 Act of March 20, 1780, §§ III, XXI (1700–1809) ......... 33

Public Statute Laws of the State of Connecticut,
 Title CXII, ch. I, §§ 1, 10 (1808) ................................. 33

Thomas Greenleaf, Laws of the State of New-York,
  Act of April 4, 1786 (1792) ........................................................... 33

Wright & Potter, 7 Acts and Laws
  of the Commonwealth of Massachusetts, 1780–1805, ch. 14
  (1898) ...................................................................................... 33

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ............................................................. 1

Fed. R. App. P. 32(a)(5) ................................................................. 51

Fed. R. App. P. 32(a)(6) ................................................................. 51

Fed. R. App. P. 32(a)(7)(B) ............................................................ 51

Fed. R. App. P. 32(f) .................................................................... 51

Fed. R. Crim. P. 52(b) .................................................................. 43

**United States Sentencing Guidelines**

U.S.S.G. Ch.5, Pt.A (Sentencing Table) ........................................... 7

U.S.S.G. §5G1.1(c)(1) .................................................................. 7

**Other Authorities**

Adam Winkler,
  *Heller's Catch-22*,
  56 UCLA L. Rev. 1551 (2009) ...................................... 31, 34, 36

Alice Ristroph,
  *The Second Amendment in a Carceral State*,
  116 Nw. U. L. Rev. 203 (2021) ...................................................... 27

C. Kevin Marshall,
  *Why Can't Martha Stewart Have A Gun?*,
  32 Harv. J.L. & Pub. Pol'y 695 (2009) ....................................... 34

Carlton F.W. Larson,
 *Four Exceptions in Search of A Theory:*
 District of Columbia v. Heller *and Judicial Ipse Dixit*,
 60 Hastings L.J. 1371 (2009) ..................................................... 34

Joseph G. S. Greenlee,
 *The Historical Justification for Prohibiting Dangerous Persons*
 *from Possessing Arms*,
 20 Wyo. L. Rev. 249 (2020) .................................................*passim*

Nelson Lund,
 *The Second Amendment,* Heller*, and Originalist Jurisprudence*,
 56 UCLA L. Rev. 1343 (2009) ..................................................... 31

Robert H. Churchill,
 *Gun Regulation, the Police Power,*
 *and the Right to Keep Arms in Early America*,
 25 Law & Hist. Rev. 139 (2007).................................... 28, 30, 38

## Subject Matter and Appellate Jurisdiction

**1. Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

**2. Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas entering a judgment of criminal conviction and sentence. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). The judgment here was entered on December 5, 2022. ROA.8. Collette filed a notice of appeal three days later, on December 8, 2022. ROA.8, 168–70.

## Issues Presented for Review

Title 18 U.S.C. § 922(g)(1) categorically bars all convicted felons (meaning those convicted of "a crime punishable by imprisonment for a term exceeding one year") from possessing firearms "in or affecting commerce" or which have been "shipped or transported in interstate or foreign commerce." Collette's conviction under this statute presents two issues:

1) Is § 922(g)(1) unconstitutional under the Second Amendment?

2) Does § 922(g)(1) exceed Congress' powers under the Commerce Clause?

## Statement of the Case

Collette raises two challenges to his conviction of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). First, he argues that the district court erred by denying his motion to dismiss the indictment because the statute is unconstitutional under the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Second, he argues that the statute exceeds Congress' power under the Commerce Clause. That issue is foreclosed by precedent; Collette raises it to preserve it for further review by the Supreme Court.

1.  Collette is a convicted felon. He has prior state convictions for felony possession of controlled substances (marijuana and cocaine) and for being a felon in possession of a firearm. ROA.697–99. Here, Collette was charged in a one-count indictment with violating § 922(g)(1) by possessing two firearms—a Glock 19 9mm pistol and a Smith & Wesson .40 caliber pistol—that had been "shipped and transported in interstate commerce[.]" ROA.21.

This charge stemmed from Collette's arrest following the repossession of his car in Midland, Texas. ROA.691–92. When Collette went to the towing yard to retrieve his belongings from the car, he

argued with the office manager at the towing yard about their procedures. ROA.691. One of those belongings was a holstered Glock. ROA.691–92. As Collette was leaving the towing yard, he pointed the gun at the manager while waiving it around—behavior that prompted the manager to call the police. ROA.691.

Police officers arrested Collette when he returned to the business that evening. ROA.691–62. He admitted that he kept the Glock in his car and that he also had a Smith & Weston pistol at home. ROA.691–92. Collette said that he took the Glock home after retrieving it from his car earlier that day. ROA.692. Collette showed officers pictures of the two pistols on his phone. ROA.692.

Officers got a search warrant for Collette's apartment to seize the firearms. ROA.692. When they arrived, they could smell marijuana. ROA.692. Collette's girlfriend was there at the time, but they let her leave. ROA.692. Officers found a gun holster and a pound of marijuana in the apartment, but no guns. ROA.692.

Officers contacted Collette's girlfriend, and she told them that Collette had called her earlier and told her to move the guns. ROA.692. She had called a friend of hers to come get them. ROA.692. Officers retrieved both pistols—the Glock and the Smith & Wesson—from the friend. ROA.692. They believed that Collette

had used his Apple watch to tell his girlfriend to move the guns. ROA.692.

2. Collette pleaded not guilty and proceeded to trial. The morning of trial, Collette filed a motion to dismiss the indictment, arguing that "§ 922(g)(1) is unconstitutional under the Second Amendment, both facially and as applied to [him], under the new standard announced by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)." ROA.110; *see* ROA.141. He argued that the charged conduct—"possession of a firearm commonly used for self-defense"—is protected by the plain text of the Second Amendment. ROA.111; *see* ROA.114–16. The statute is facially unconstitutional, Collette argued, because the Government cannot satisfy its burden, under *Bruen*, of establishing that § 922(g)(1) is consistent the Nation's history of firearm regulation given the lack of similar founding-era laws. ROA.117–21. And he argued that the § 922(g)(1) is unconstitutional as applied to him because he has never been convicted of any violent crimes. ROA.121–23.

Before the trial began, the district court announced that it was carrying the motion, which it said was "a good motion to file[,]" with the trial "to give the Government time to respond" to it. ROA.262;

*see* ROA.141. Collette apologized for "filing it late," but the court told him that wasn't a problem and that it "appreciate[d] [him] filing" the motion.[1] ROA.263. The court also said that it was "a smart thing to do, either now or at some point," and that Collette "did the right thing." ROA.263.

At trial, the Government presented testimony and audio exhibits from the office manager and the police officers about the events that day at the towing yard, Collette's arrest and interrogations, and the recovery of the pistols. Also, an ATF agent testified that the Glock and Smith & Wesson had been manufactured in Austria and Connecticut, respectively, and had traveled interstate to make it to Texas. ROA.401–02.

The jury found Collette guilty as charged in the indictment. ROA.137.

3. The presentence report recommended a Sentencing Guidelines range of 110 to 137 months' imprisonment, based on a total

---

[1] *Bruen* was handed down on June 23, 2022, about two-and-a-half months before Collette was tried in September 2022.

offense level of 26 and a criminal history category of V.[2] ROA.704. The offense level calculation included enhancements for possessing the firearms in connection with another felony offense (the pound of marijuana found in Collette's apartment, or an aggravated assault based on Collette's actions at the towing yard), and obstruction of justice (based on the officers' belief that Collette told his girlfriend to remove the guns from the apartment). ROA.693. Collette objected to both enhancements. ROA.707–14.

4.   The Government never responded to Collette's motion to dismiss. *See* ROA.144. About two-and-a-half weeks after the trial, the district court denied the motion in a memorandum opinion. ROA.140–57. The court agreed that *Bruen* had abrogated the two-step means-end scrutiny that courts had used to analyze challenges to firearms laws before that decision. ROA.142–43. Applying the

---

[2] Although the Guidelines Sentencing Table produces a range of 110 to 137 months at 25, VI, the statutory maximum of 10 years capped the range at 120 months. ROA.704; *see* U.S.S.G. §5G1.1(c)(1); Ch.5, Pt.A (Sentencing Table); 18 U.S.C. § 922(g)(1), 924(a)(2). The statutory maximum was increased to 15 years in late June 2022, after Collette committed the instant offense. *See* Bipartisan Safer Communities Act, Pub. L. 117-159, § 12004(c)(1), (2), 136 Stat. 1313, 1329 (striking § 922(g) from § 924(a)(2) and adding § 924(a)(8)).

*Bruen* framework, the court concluded that Collette's conduct—possession of a firearm—was covered by the plain text of the Second Amendment. ROA.144. Thus, the court recognized that, under *Bruen*, "§ 922(g)(1)'s constitutionality hinges on whether the Government can show that prohibiting felons from possessing a firearm is consistent with the Nation's historical tradition of firearm regulation." ROA.144.

On the historical question, the district court "note[d] that the Government did not respond to" Collette's motion to dismiss. ROA.144. Nevertheless, the court "conduct[ed] its own historical inquiry[,]" "stress[ing] the importance of constitutional questions like the one here." ROA.144–45.

The court began by acknowledging that the law "prohibiting felons from possessing firearms at the federal level is less than 65 years old." ROA.146. As for founding-era laws, the court recognized that "history lacks direct examples about felons specifically[.]" ROA.148 (discussing, *inter alia*, then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 451–69 (7th Cir. 2019)).

But in the district court's view, "just because there are no straightforward examples does not mean the Court's historical inquiry stops there." ROA.148. The court went on to conclude that

"[t]here is a historical tradition of excluding felons from 'the people'" protected by the text of the Second Amendment. ROA.154. In the court's view, "the people" is a term that "means only those with political rights." ROA.149. The court then pointed to laws that prohibit felons from voting and to case law limiting the First Amendment rights of speech and assembly. ROA.151–54. Based on these "historical analogies[,]" the court concluded that "this Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and powers of 'the people.'" ROA.154. Reasoning that "the right under the Second Amendment should be no different[,]" the court concluded that "§ 922(g)(1) is constitutional on its face and as applied to" Collette. ROA.155.

5.  At sentencing, the district court overruled Collette's objections to the PSR, adopted the report and the Guidelines calculations, and sentenced Collette to 120 months' imprisonment and three years' supervised release. ROA.163–64, 251–52, 255–56.

5.  Collette appealed. ROA.71.

## Summary of the Arguments

**I. 18 U.S.C. § 922(g)(1) violates the Second Amendment because firearm possession is protected by the plain text of the Amendment, and the Government cannot show a historical tradition of categorically disarming felons.**

Collette's conviction for being a felon in possession of a firearm should be reversed because the statute of conviction unconstitutionally infringes on his rights under the Second Amendment. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court reaffirmed that the Second Amendment right to bear arms is not a second-class right. 142 S. Ct. 2111, 2156 (2022). The Court rejected decades of "judicial deference to legislative interest balancing" in the form of means-end scrutiny in Second Amendment jurisprudence. *Id.* at 2131. Instead, it announced that a modern firearm regulation's constitutionality depends only on the Second Amendment's text and historical understanding.

Under this new framework, 18 U.S.C. § 922(g)(1) violates the Second Amendment. The statute impacts the core Second Amendment right to possess a firearm for self-defense. This right belongs to all "the people" under the Constitution, including felons. And the Government cannot meet its burden to show § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation,

because there is no relevant historical evidence of categorically disarming felons.

## II. 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress' power to regulate interstate and foreign commerce; alternatively, it should be construed to require a closer connection to interstate commerce than alleged or admitted in this case.

Collette also preserves for further review by the Supreme Court his argument, foreclosed by circuit precedent, that § 922(g)(1) exceeds Congress' power to regulate interstate commerce because that statute permits a conviction based only on the manufacture of the firearm or ammunition outside the state in which it was possessed.

## Arguments and Authorities

**I.  18 U.S.C. § 922(g)(1) violates the Second Amendment because firearm possession is protected by the plain text of the Amendment, and the Government cannot show a historical tradition of categorically disarming felons.**

Collette was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He moved to dismiss the indictment, arguing that the statute is unconstitutional under the Second Amendment as interpreted in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022). Under *Bruen*'s framework for assessing the constitutionality of firearms restrictions, the first question is whether the challenged conduct is covered by the plain text of the Second Amendment. If so, the law is presumptively unconstitutional and the burden shifts to the Government to provide evidence that the restriction is consistent with this Nation's historical tradition of firearm regulation.

After a jury found Collette guilty as charged in the indictment, the district court denied Collette's motion. That was error. Although the court correctly recognized that the Second Amendment covered the charged conduct—firearm possession—it erred in its historical analysis. The Government never responded to Collette's motion to dismiss the indictment, so it offered no evidence on any relevant

history. Because it is the Government's burden to do so, that silence should alone be sufficient to reverse the district court's denial of Collette's motion. Nevertheless, the district court undertook its own historical analysis. It concluded, through analogy to laws depriving felons of voting rights, and case law regarding First Amendment speech and assembly rights, that felons are not among "the people" protected by the Second Amendment. Because that analysis is inconsistent with the *Bruen* framework, the court erred in denying Collette's motion to dismiss. This Court should reverse the district court's denial of the motion and vacate Collette's conviction.

### A. Standard of review.

The Court reviews constitutional challenges to a statute *de novo. See United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023) (quoting *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2011)), *petition for cert. filed*, No. 22-915 (U.S. Mar. 21, 2023).

### B. Bruen abrogated the Second Amendment framework previously employed by circuit courts after *Heller*.

The Second Amendment to the United States Constitution mandates that a "well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v.*

*Heller*, 554 U.S. 570, 630 (2008), the Supreme Court held that the Second Amendment codifies an individual right to possess firearms, the "central component" of which is self-defense. *See Bruen*, 142 S. Ct. at 2133 (citing *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)).

After *Heller*, this Court "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). In the first step, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)). This involved determining "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 754. If the conduct was outside the scope of the Second Amendment, then the law was constitutional. *Id.* Otherwise, courts proceeded to the second step, to determine whether to apply strict or intermediate scrutiny. *Id.* That means-end framework has now been repudiated by the Supreme Court. *See Bruen*, 142 S. Ct. at 2127; *see also Rahimi*, 61 F.4th at 450.

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims, abrogating the two-step inquiry adopted by this Court and others. *Bruen* rejected the second step of that framework because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127. *Bruen* reasoned that "[s]tep one of the predominant framework is broadly consistent with Heller, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. Under *Bruen*'s framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. Only then may a court conclude that the individual's conduct falls outside of the Second Amendment's "unqualified command." *Id*.

**1. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1): possession of a firearm.**

Section 922(g)(1) permanently disqualifies all felons from exercising the fundamental right to possess firearms for self-defense. The district court correctly concluded that, under the plain text of

the Second Amendment, the statute is presumptively unconstitutional. ROA.144; *See Bruen*, 142 S. Ct. at 2129–30.

The Second Amendment protects "the right of the people to keep and bear Arms …." U.S. Const. amend. II. The plain text—"keep and bear arms"—means possessing and carrying weapons. *Heller*, 554 U.S. at 583–92. *Bruen* clarified that the core right to possess and carry a firearm for self-defense, identified in *Heller* and *McDonald*, extends outside the home. 142 S. Ct. at 2122. Section 922(g)(1) is a complete ban on all firearm possession, without regard to the type of firearm or the way it is used. It therefore infringes upon the core Second Amendment right to possess a firearm for self-defense. *See McDonald*, 561 U.S. at 767; *see also Rahimi*, 61 F.4th at 454 (possession of rifles and pistols, weapons "in common use today," "easily falls within the purview of the Second Amendment").

The sole question at this stage of the *Bruen* analysis is whether "conduct" is covered by the plain text of the Second Amendment. 142 S. Ct. at 2126. Because firearm possession is conduct covered by the Second Amendment, it is presumptively protected.

## 2. Felons are among "the people" protected by the Second Amendment.

The question of a person's status, as a felon or otherwise, is irrelevant at this stage of the *Bruen* framework. The Second Amendment covers felons by recognizing that the right to keep and bear arms belongs to "the people." U.S. Const. amend. II. Because "the people" includes "all Americans[,]" *see Heller*, 554 U.S. at 581, whether a category of person can be disarmed is a question of historical tradition, which is the Government's burden under *Bruen*.

*Heller* rejected the theory that "the people" protected by the Second Amendment were limited to a subset—*i.e.*, those in a militia. 554 U.S. at 579–81, 592–600. *Heller* explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 580–81.

Like the First, Fourth, and Ninth Amendments, the Second Amendment codified an individual right. *Id.* at 579–80. This is distinguishable from other Constitutional provisions for "collective"

actions by "the people," like voting, which enumerate the civic exercise of powers, not rights. *Id*. Individual rights extend to "the people," or a "'class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of the community.'" *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Categorically excluding felons from the plain text of the Second Amendment would, therefore, endanger felons' basic protections under the First and Fourth Amendments, or else run afoul of *Bruen*'s directive that the Second Amendment is "not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality op.))

One sitting Justice has explained that this language from *Heller* means that a person's status is properly considered in the question of historical tradition, rather than the existence of the right. In *Kanter v. Barr*, then-Judge Barrett observed that, under *Heller*, the word "people" refers to "all Americans," meaning that felons are not "categorically excluded from our national community." 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). The "question is whether the government has the power to disable the exercise of a

right that they otherwise possess, rather than whether they possess the right at all." *Id.* Thus, a person's status as a felon is properly considered in the historical tradition inquiry and does not affect whether the person has a Second Amendment right. *Id.* at 451–52.

Nevertheless, some district courts have held that felons are excluded from "the people" protected by the Constitution, because *Heller* and *Bruen* referenced "law-abiding" citizens in dicta. *See United States v. America v. Riley*, No. 1:22-cr-163 (RDA), 2022 WL 7610264, at *10–11 (E.D. Va. Oct. 13, 2022). The district court here concluded that felons are excluded from "the people" for a slightly different reason: it read *Heller* to define "the people" as "only those with political rights." ROA.149. But neither *Heller* nor *Bruen* held that "the people" is limited to "law-abiding" citizens or excludes felons. Rather, *Heller* explained that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. Similarly, in *Bruen*, the Court noted that it was undisputed that the petitioners—"two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects. 142 S. Ct. at 2134. The Court did not hold the reverse—that being law-abiding was a

prerequisite to enjoying the basic protections of the Second Amendment. Such a reading would conflict with *Bruen*'s language that the "Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."[3] *Bruen*, 142 S. Ct. at 2156.

In *Rahimi*, this Court rejected the argument that the Second Amendment applies only to "law-abiding" citizens in the context of a challenge to the similar ban on possession of firearms by persons subject to domestic violence protective orders, under 18 U.S.C. § 922(g)(8). *Rahimi*, 61 F.4th at 451–53. The Court rejected the Government's argument that the Second Amendment could be so limited because of the ample scope of Constitutional protections for

---

[3] The use of "law-abiding" could also be understood as describing the purpose for exercising the right, rather than defining a category of person. *See McDonald*, 561 U.S. at 749 (reiterating that *Heller* "held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense"). *Heller*'s use of "law-abiding" or "lawful" is not tied to the category of person, but to the purpose for which the firearm is used. *See, e.g., Heller*, 554 U.S. at 577, 595, 620, 625, 626, 630 (repeatedly describing the historical right as one to bear arms "for a lawful purpose" and categorizing its limitations on the purpose or type of confrontation, not the category of person).

"the people," and finding that the Supreme Court's references to "law-abiding" citizens were meant to reference instead the historical exclusion of certain groups. *Id.* Whether people convicted of felony offenses are so historically excluded is a question to be examined in the second stage of the *Bruen* analysis.

Because the Second Amendment right belongs to "all Americans," *Heller*, 554 U.S. at 580–81, § 922(g)(1)'s categorical ban on an individual's possession of a firearm based on their status as a felon is presumptively unconstitutional under the plain text of the Second Amendment at the first stage of the *Bruen* analysis. Whether a category of people can be disarmed is a question of historical tradition, which is the Government's burden under *Bruen*.

### 3. The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."

The district court correctly recognized that, because the Second Amendment presumptively protects the conduct prohibited by § 922(g)(1), the *Bruen* framework requires the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Rahimi*, 61 F.4th at 453 (quoting *Bruen*, 142 S. Ct. at 2130); *see* ROA.144. But the district court strayed from the framework *Bruen* established for

analyzing whether such a historical tradition exists. The district court analogized § 922(g)(1) to laws barring felons from voting and to precedent limiting the First Amendment rights to speech and assembly. *See* ROA.148–55. That was the wrong approach. *Bruen* described three metrics by which the sufficiency of the historical precedent should be analyzed: temporal proximity to the founding era, similarity to the challenged restriction, and breadth. 142 S. Ct. at 2130–34, 2136, 2138.

*First*, regarding temporal proximity to the founding era, "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35; emphasis in *Bruen*). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions

change in the intervening years."[4] *Id*. Similarly, the Court explained that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id*. The Court expressed skepticism about reliance on laws passed long after the passage of the Second Amendment and explained, "to the extent later history contradicts what the text says, the text controls." *Id*. at 2137.

*Second*, the founding-era historical precedent must be comparable to the challenged regulation. How similar the historical precursors must be to the challenged law depends on the societal problem it seeks to address. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the Government must identify distinctly similar historical regulations.

---

[4] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's pronouncement on a state regulation or law. The Supreme Court did not hold for a challenge to a federal statute that regulations from around the passage of the Fourteenth Amendment, or 1868, would carry the same weight as those from around ratification of the Second Amendment, or 1791. *See Bruen*, 142 S. Ct. at 2137–38; *see also id.* at 2163 (Barrett, J., concurring). Indeed, *Bruen* acknowledged that 19th century evidence was secondary to that from the Nation's founding, *see id.* at 2137, and its value is likely even more limited when addressing a federal statute.

*Bruen*, 142 S. Ct. at 2131. The "lack of a distinctly *similar* historical regulation addressing that problem" or evidence that earlier generations addressed the societal problem through materially different means "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added). The total handgun ban in *Heller* and public-carry restriction in *Bruen* involved this type of "straightforward" historical inquiry. *Id.*

*Bruen*'s historical analysis illustrates that "distinctly similar" means the regulations are nearly identical or meaningfully the same. In contrast, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy ...." *Id.* Whether a historical regulation is a proper analogue for a uniquely modern regulation turns on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id.* at 2132–33. But this "nuanced approach" only applies to "modern regulations that were unimaginable at the founding." *Id.* at 2132. As this Court phrased the inquiry in *Rahimi*, regarding a different provision in § 922(g), whether the historical

precedents are "relevantly similar" depends on a comparison of how the laws restricted the right bear arms and why the burden was so placed, neither requiring a "historical twin" nor accepting an analogue that "remotely resembles" current law but "risks endorsing outliers that our ancestors never would have accepted." *Rahimi*, 61 F.4th at 454 (quoting *Bruen*, 142 S. Ct. at 2132–33).

*Third*, the Government must show "a *tradition* of broadly prohibiting" conduct in the manner of the challenged restriction. *Bruen*, 142 S. Ct. at 2138 (emphasis added). In other words, the founding-era historical evidence must show "a governmental practice has been open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). The Government cannot "simply posit that the regulation promotes an important interest." *Id.* at 2126. Nor can it rely on "outlier" historical restrictions. *Id.* at 2133, 2156. Indeed, *Bruen* "doubt[ed] that *three* colonial regulations could suffice to show a tradition[.]" *Id.* at 2142. Moreover, it is incumbent on the Government, not the Court, to provide the record of this broad historical tradition. *See id.* at 2130 n.6, 2150.

### a. The history of categorical firearms restrictions does not support disarming felons.

Reviewing historical examples of categorical restrictions on firearm possession—*i.e.*, wholesale disarmament of a particular category of person—sets the proper backdrop for the *Bruen* analysis of temporal proximity to the founding era, similarity to the challenged restriction, and breadth. While there is some limited historical evidence of disarming certain specific categories of people, none support finding § 922(g)(1) constitutional.

Historical analyses of firearms rights and regulations generally begin with pre-founding English common law, though *Bruen* cautions against placing undue emphasis on English laws, particularly laws that long predate this Nation's founding. *See Bruen*, 142 S. Ct. at 2138–39. As early as the 15th and 16th centuries, English law targeted potentially disloyal communities, including Catholics and the Welsh, for disarmament. *See* Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 257–65 (2020). In the Restoration period following the English Civil War of the mid-17th century, the Stuart monarchs more aggressively disarmed political and religious dissidents. *See Heller*, 554 U.S. at 592–93. For example, the

Militia Act of 1662 permitted disarming those adjudged to be "dangerous to the Peace of the Kingdom;" the 1671 Game Act involved disarmament of those who did not own property, particularly in Protestant regions; and forfeiture of "armour" could be ordered for those who went "armed to terrify the King's subjects." *Id.*; *see Kanter*, 919 F.3d at 457 (Barrett, J., dissenting).

Following the Glorious Revolution in 1688, a Convention of elected representatives drafted the Declaration of Rights—a predecessor to the Second Amendment codified as the English Bill of Rights—which included that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by law." *See Heller*, 554 U.S. at 593; Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021). Almost immediately thereafter, Parliament began disarming Catholics viewed as potential dissidents. *See Heller*, 554 U.S. at 593. Indeed, through the 18th century, England targeted "papists and other disaffected persons, who disown his Majesty's government," for disarmament, to quell concerns over potential rebellions and insurrections. *See* Greenlee at 260–61. The most discernable

27

English tradition prior to American independence was the disarmament of religious dissidents perceived as threatening to the crown. *See id.* at 257–61.

In the American colonies during the 17th and 18th centuries, categorical disarmament was largely reserved for Indians, indentured servants, slaves, black freedmen, and others outside of the "body politic." *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 156–58 (2007). Scholars have likewise recognized a trend of disarming individuals who voluntarily excluded themselves from that "body politic" by refusing to swear allegiance, first to the crown, and later to the American Revolution and newly established states and commonwealths. *Id.* at 157–61. As in England, the colonial period also included examples of disarming individuals based on their religion, where religious expression was deemed seditious or incompatible with loyalty to the sovereign. *See* Greenlee at 263.

The Second Amendment was ratified in 1791. The codification of the right repudiated the attempted disarmament of disloyal colonists, much like its English precursor was a rejection of the disarmament of dissidents in Restoration-era England. *See Heller*, 554

U.S. at 592–95, 598. Commentary immediately following ratification illustrates the view that certain restrictions from the English Restoration were inconsistent with the right that was ultimately codified in the Second Amendment. *See id.* at 606–08. And while the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions included proposals to limit the right to "peaceable citizens," or to expressly permit disarmament for those in "rebellion" or for "crimes committed," this language was not included in the Second Amendment itself.[5] *See Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting).

Historical evidence from the period immediately surrounding ratification is entitled to significant weight under *Bruen*. While

---

[5] In *Rahimi*, this Court rejected the use of many of these historical English and colonial era laws with regard to the restriction on possession of firearms by those subject to protective orders, but did so by focusing on the clear dissimilarities between those laws and that specific provision, including that these earlier English and colonial-era laws were targeted at preserving the social and political order generally, and not at the protection of individuals by the threat posed by another, and that other laws proffered by the government were based on criminal proceedings rather than the civil proceedings underlying § 922(g)(8)'s prohibition. 61 F.4th at 457.

some categorical firearms restrictions persisted during this time, scholars have noted the period was marked by less burdensome temporary restrictions and the ability to have firearms rights restored. *See* Greenlee at 268–70. For example, some religious dissidents in the Massachusetts Bay Colony had their rights restored after expressing contrition, and even those who engaged in an armed rebellion in Massachusetts were only subjected to a three-year prohibition on bearing arms. *Id.*

By the 19th century, "prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen," or on targeted disfavored groups like "tramps." Greenlee at 269–70. But these prohibitions, like earlier laws, did not disarm felons as a class. After a full survey of printed session laws on gun regulation, history professor Robert H. Churchill concluded: "[A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Churchill at 142, 143 n.11.

It was not until the 20th century that legislatures began to pass modern, categorical firearms bans, including on felons. *See* Green-

lee at 272–75. Congress passed the first version of the modern federal firearm ban for violent felons in 1938, expanding it to include non-violent felons in 1961 and all possession in 1968.[6] State laws disarming felons were, likewise, first adopted in the early 20th century. *See* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar).

A brief review of English and early American historical categorical firearms restrictions evinces a troubling tradition of disarming religious and political dissidents and targeted minority communities, but not felons. The Second Amendment is properly understood as a repudiation of many of these oppressive regulations, rather than an endorsement of such categorical restrictions. But insofar as

---

[6] *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed); Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat. 757 (repealed); Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

the United States incorporated any tradition of categorical exclusion, it assuredly did not include the targeted disarmament of felons until the 20th century.

### b. There is no evidence of "distinctly similar" founding-era regulations disarming all felons.

Turning to the *Bruen* framework, the Government must provide historical examples of regulations that are "distinctly similar" to § 922(g)(1) because, as in *Heller* and *Bruen*, the restriction does not address "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132–33. Section 922(g)(1) categorically bans firearm possession by all felons. Crime and felons have existed since the founding. So too has the presumed "societal concern" addressed by § 922(g)(1): felons possessing firearms. The Government cannot therefore rely on the "nuanced approach" of "analogical reasoning" using "relevantly similar" analogues. *See Bruen*, 142 S. Ct. at 2132. The "relevantly similar" inquiry is reserved for statutes addressing uniquely modern problems that would have been "unimaginable" at the founding. *See id*.

There are no "distinctly similar" founding-era laws demonstrating a tradition of broadly prohibiting firearm possession by felons.[7] *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (noting scholars

---

[7] To the contrary, there is considerable evidence that felons were included among those citizens to whom the Second Amendment was expressly directed. Even though the right protected by the Second Amendment "does not depend on service in the militia[,]" *Bruen*, 142 S. Ct. at 2127, it must extend to at least the pool of individuals from whom the militia would be drawn. And in the founding era, felons were part of the militia pool. Just one year after the ratification of the Second Amendment, Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty five years … shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271. The Act "exempted" certain class of people, but not felons. *Id.* § 2, 1 Stat. 272. Similar contemporaneous state militia statutes also failed to exempt felons. *See* Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134–36 (1797); Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808); Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367–70 (1799); Wright & Potter, 7 Acts and Laws of the Commonwealth of Massachusetts, 1780–1805, ch. 14, at 381–82, 389–90 (1898); Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251–52, 256 (1805); Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227–28, 232–33 (1792); Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700–1809); Marbury, Digest of the Laws of the State of Georgia, Act of December 24, 1792, §§ 9–10, at 350 (1802).

have not been able to identify any founding-era laws disarming all felons); *see also* Winkler at 1563 ("The Founding generation had no laws … denying the right to people convicted of crimes."). The earliest firearm restrictions for felons in America were passed in the 20th century. *See, e.g.*, Greenlee at 272–75; C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."); Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) ("As far as I can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century. The earliest such law was enacted in New York in 1897, and similar laws were passed by Illinois in 1919, New Hampshire, North Dakota, and California in 1923, and Nevada in 1925.").

The modern statutes that dispossess felons of firearms, including § 922(g)(1), bear "little resemblance to laws in effect at the time the Second Amendment was ratified." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also Nat'l Rifle Ass'n of Am.*, 700 F.3d

at 196. Reliance on the passage of § 922 itself to support its own historical tradition is logically circular and ignores *Bruen*'s skepticism of 20th century historical evidence. *See Bruen*, 142 S. Ct. at 2137, 2154 n.28; *cf. Scarborough v. United States*, 431 U.S. 563, 569 (1977) (§ 922(g)(1)'s predecessor "was a last-minute amendment to the Omnibus Crime Control Act enacted hastily with little discussion and no hearings.").

Before *Bruen*, courts often acknowledged the absence of founding-era felony restrictions. Yet they concluded that § 922(g)(1) was constitutional by relying on *Heller*'s dicta that prohibitions on felon firearm possession were "longstanding," or by applying means-end scrutiny that *Bruen* swept aside. *See, e.g., Booker*, 644 F.3d at 24 (noting that *Heller*, 554 U.S. 626–27 & n.16 did not cast doubt on longstanding prohibitions on firearm possession by certain individuals, including felons, which are presumptively lawful)); *Medina v. Whitaker*, 913 F.3d 152, 159–60 (D.C. Cir. 2019) (same); see also *United States v. Williams*, 616 F.3d 685, 691–94 (7th Cir. 2010) (holding that § 922(g)(1) survives Second Amendment challenge under intermediate scrutiny).

This reasoning is irreconcilable with the framework laid out in *Bruen*, which expressly rejected the use of means-end scrutiny.

*Bruen*, 142 S. Ct. at 2127–30. Moreover, the "longstanding prohibitions" language in *Heller* is dicta, and courts have cautioned against reliance on it. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); *see also* Winkler at 1567. *Bruen* requires the Government to provide "distinctly similar" historical examples from the founding era to prove that a restriction on the Second Amendment right is consistent with the Nation's traditions. *See generally Bruen*, 142 S. Ct. 2111. *Heller* did not provide the historical basis for its "longstanding prohibitions" dicta, and *Bruen* acknowledged as much. *See Bruen*, 142 S. Ct. at 2128 (noting its prior caution that it was not undertaking an "exhaustive historical analysis … of the full scope of the Second Amendment"). *Bruen* did not carve out an exception to its framework for firearm restrictions for felons.[8] Courts are simply not permitted to disregard the framework laid out in

---

[8] *Bruen*'s majority opinion is silent about this issue. Justice Kavanaugh, in a concurring opinion joined by Chief Justice Roberts, cited the "longstanding prohibitions" language from *Heller*. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Justice Alito also noted in a concurrence that the opinion did not disrupt the holdings of *Heller*. *Id.* at 2157 (Alito, J., concurring). But neither concurrence announced that § 922(g)(1) is constitutional or subject to a relaxed Second Amendment analytical framework.

*Bruen* based on dicta from *Heller*. If categorical prohibitions for felons are indeed "longstanding" and satisfy the newly articulated framework in *Bruen*, the Government would be able to identify specific "distinctly similar" historical examples of such a tradition. But it cannot.

The absence of founding-era laws specifically disarming felons forecloses the Government's ability to show "distinctly similar historical regulation[s]" like § 922(g)(1).

### c. The Government cannot satisfy the "relevantly similar" inquiry either.

In *Rahimi*, this Court appeared to adopt the "relevantly similar" standard for all forms of firearm regulation, regardless of whether the societal problem was of a long-standing nature. *See Rahimi*, 61 F.4th at 455–60. Even if the Court applied this more "nuanced approach," which should be reserved under *Bruen* for statutes addressing unprecedented modern problems, there is no evidence of "relevantly similar" firearms restrictions to § 922(g)(1) from the founding era. Courts that have upheld § 922(g)(1) since Bruen have largely eschewed the requirement to show specific similar historical regulations. Instead, many have relied on general arguments by the

Government that § 922(g)(1) is consistent with traditions of disarming other "unvirtuous" citizens. This is inconsistent with *Bruen*.

Even prior to *Bruen*, some courts relied on a purported tradition of disarming "unvirtuous" citizens to support modern felon disarmament laws. *See Medina*, 913 F.3d at 159 (collecting cases). Scholars have, however, noted the absence of historical support for this "virtuous citizen" theory. *See Greenlee* at 275–83. The earliest articles promoting the theory fail to cite to any historical evidence. *See id*. Rather, as described above, historical categorical disarmament was generally limited to disempowered minority communities—*e.g.*, slaves and Indians—and those who evidenced disloyalty to the government. *See id.* at 261–65; Churchill at 156–61. Many of these types of categorical restrictions were rejected by the Second Amendment but even those of arguable historical relevance do not "impose a comparable burden on the right" and are not "comparably justified" to § 922(g)(1)'s categorical disarmament of felons.[9] *See Bruen*, 142 S. Ct. at 2133 (explaining metrics of comparing "relevantly similar" analogues).

---

9

*Bruen* also expressly rejected the type of overly generalized reasoning employed under the "virtuous citizen" theory. In *Bruen*, the state of New York relied on a select few disparate historical restrictions on public carry of firearms for specific purposes or in specific sensitive places, to establish a more general principle of limiting all public carry. 142 S. Ct. at 2135, 2142–50. Throughout *Bruen*, the Court reasoned that the respondents had "define[d] the category … far too broadly," and rejected the extrapolation of a broad tradition from a few narrow historical restrictions. *See id.* at 2134, 2150, 2156. The same is true here. Historical evidence of disarming slaves, Indians, and political opponents cannot be generalized to encompass all "unvirtuous" people—a term that mischaracterizes those historical categories and which would encompass considerably more categories than felons. The term lacks a limiting principle and is defined "far too broadly." *See id.* at 2134; *cf. Medina*, 913 F.3d at 159–60 (rejecting the similar "dangerousness standard" as too "amorphous ... to delineate the scope of the Second Amendment"). It also invites deference to legislatures to define the "unvirtuous" people and reliance on something like means-end scrutiny for courts to review that definition. Both were repudiated by *Bruen*. 142 S. Ct. at 2131.

The district court employed similar "virtuous citizen" reasoning here, concluding that historical felony restrictions on rights unrelated to firearms, such as voting, can serve as "relevantly similar" historical evidence to support the constitutionality of § 922(g)(1). ROA.148–55. This approach is inconsistent with *Bruen* and the Second Amendment for three reasons. First, the comparison misunderstands that civic or collective rights like voting are fundamentally distinguishable from individual rights like the one protected by the Second Amendment. *See Kanter*, 919 F.3d at 462–64 (Barrett, J., dissenting); *Heller*, 554 U.S. at 579–80. Second, it ignores that *Bruen* requires the Government to show consistency with the "historical tradition of *firearm* regulation." *Bruen*, 142 S. Ct. at 2130 (emphasis added). *Bruen*'s comparison of historical analogues turns on *how* and *why* the regulations burden *the right to armed self-defense. See id.* at 2133. This analysis cannot be applied to historical restrictions on voting or other rights because they simply do not burden the Second Amendment right. Third, it ignores that the analysis should be limited to "distinctly similar" historical examples. *See id.* at 2131.

Moreover, insofar as this "virtuous citizen" theory is grounded in presumptions about the Founders' views on firearms rights, it is

simply not the test laid out by *Bruen*. *Bruen* directed parties to compare challenged firearms laws to actual historical regulations ("historical tradition of firearm regulation"), not merely the Founders' views. *Bruen*, 142 S. Ct. at 2130 (emphasis added)); *see also id.* at 2142 ("[T]here is little evidence of an early American practice of regulating public carry by the general public.").

That the Founders may have identified and considered the possibility of disarming felons, but ultimately did not, also itself illustrates that § 922(g)(1) is unconstitutional. *Bruen* counsels that earlier generations addressing a problem "through materially different means," or rejecting efforts to put forth analogous regulations, is evidence of a challenged statute's unconstitutionality. *See id.* at 2131. Even if this Court were to rely on representations about the Founders' views about the scope of the Second Amendment—and *Heller* warned it was "dubious to rely on such history to interpret a text that was widely understood to codify a pre-existing right[,]" 554 U.S. at 603—the fact that the Amendment does not include proposed language limiting the right for certain categories of people is evidence that the Founders rejected this construction. *See Kanter*, 919 F.3d at 454–56 (Barrett, J., dissenting) (describing rejected proposals from the New Hampshire, Massachusetts, and Pennsylvania

ratifying conventions, which could have limited those covered by the Second Amendment).

This Court rejected a similar argument proffered by the Government in *Rahimi*, offering as a historical analogue proposals at various state ratification conventions which were not adopted ultimately in the text of the Second Amendment. *See Rahimi*, 61 F.4th at 457 (stating that proposals of various founding fathers, ultimately not adopted, "might somewhat illuminate the scope of firearms rights at the time of ratification, but they cannot counter the Second Amendment text, or serve as an analogue for § 922(g)(8) because, inter alia, they were not enacted").

The "virtuous citizen" theory therefore lacks historical support and is insufficient to demonstrate an historical tradition of regulations "relevantly similar" to § 922(g)(1), as required by *Bruen*.

\* \* \*

The Government cannot show historical evidence distinctly or relevantly similar to § 922(g)(1) that would illustrate a tradition of categorically disarming felons. Thus, it cannot overcome the presumption that § 922(g)(1) violates the Second Amendment. *See Bruen*, 142 S. Ct. at 2126. *Bruen*'s new analytical framework plainly applies to § 922(g)(1) and renders the statute violative of the Second

Amendment. The Court should therefore reverse the district court's denial of Collette's motion to suppress and vacate his conviction.

## II. 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress' power to regulate interstate and foreign commerce; alternatively, it should be construed to require a closer connection to interstate commerce than alleged or admitted in this case.

### A. Standard of review.

The Court reviews this issue, raised for the first time on appeal, using the plain-error standard of review. *United States v. Toure*, 965 F.3d 393, 399 (5th Cir. 2020); *see* Fed. R. Crim. P. 52(b). A conviction under an unconstitutional statute meets the plain error standard. *See United States v. Knowles*, 29 F.3d 947, 951–52 (5th Cir. 1994). That said, Collette acknowledges that this issue is foreclosed. *See United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (per curiam) (unpublished) (summarizing precedent), *petition for cert. filed*, No. 22-6853 (U.S. Feb. 21, 2023). He raises it here for possible further review by the Supreme Court.

### B. 18 U.S.C. § 922(g)(1) exceeds Congress' power to regulate interstate and foreign commerce.

Article I, § 8 of the United States Constitution provides: "Congress shall have power … To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes …."

In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court established the test for the scope of Congress' power to regulate activities that "affect" interstate commerce: "We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Lopez*, 514 U.S. at 559. *Lopez* seemed to, but did not expressly, overrule the more permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, which required only the "minimal nexus that the firearm have been, at some time, in interstate commerce." 431 U.S. 563, 575 (1977). A fair reading of *Scarborough* suggests that the case was concerned solely with statutory interpretation and did not purport to resolve any constitutional issues. *See United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). This Court has adhered to the view that *Scarborough*'s "minimal nexus" is sufficient both to prove guilt under 18 U.S.C. § 922(g)(1) and to bring any subsequent act of firearm possession within Congress' power to regulate. *See, e.g., United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

Members of the Supreme Court and judges on lower courts have acknowledged the irreconcilability of *Lopez* and a constitutional

reading of *Scarborough*. *See Alderman v. United States*, 562 U.S. 1163, 1166 (2011) (Thomas, J., dissenting from denial of certiorari) ("*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez* ...."); *see also United States v. Hill*, 927 F.3d 188, 215 n. 10 (4th Cir. 2019) (Agee, J., dissenting) ("While some tension exists between *Scarborough* and the Supreme Court's decision in *Lopez*, the Supreme Court has not granted certiorari on a case that would provide further guidance[.]"); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting in part) ("[T]he precise holding in *Scarborough* is in fundamental and irreconcilable conflict with the rationale of" *Lopez*.).

Judge Ho's opinion dissenting from denial of rehearing en banc in *Seekins*, 52 F.4th at 988–92, is the most recent and thorough objection to the established view. "In the en banc poll, seven judges voted in favor of rehearing ..., and nine voted against rehearing ...." *Id.* at 988.

If *Scarborough* is a constitutional decision, then it grants the federal government unlimited power to regulate the affairs of citizens. *See Alderman*, 562 U.S. at 1167 (Thomas, J., dissenting from denial of certiorari) ("[T]he lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit

on the commerce power."). Any physical object has almost certainly crossed a state line at some point in the past. To hold that this past travel grants Congress a perpetual right to regulate what someone does or does not do with that object is to eliminate any restrictions on Congress' power. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012) (Roberts, C.J.) ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.") (hereinafter "*NFIB*").

This unlimited power renders 18 U.S.C. § 922(g)(1) facially unconstitutional. In *NFIB*, Chief Justice Roberts noted that "[a]s expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching '*activity*.'" 567 U.S. at 551 (emphasis added). He reasoned that this limitation of Commerce Clause power to "activities" is a "distinction between doing something and doing nothing [which] would not have been lost on the Framers, who were 'practical statesmen,' not metaphysical philosophers." *Id.* at 555 (quoting *Industrial Union Dept., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 673 (1980) (Rehnquist, J., concurring in

judgment)). Four other Justices echoed Chief Justice Roberts's sentiment regarding the Commerce Clause analysis, stating that Congress could only regulate "*activity* affecting commerce[.]" *NFIB*, 567 U.S. at 658 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting).

Here, 18 U.S.C. § 922(g)(1) does not require that Collette's possession of the gun was an economic activity; this ought to be fatal to the conviction. As explained by *NFIB*, the Commerce Clause permits Congress to regulate only activities, *i.e.*, the active participation in a market. But § 922(g)(1) criminalizes all possession, without reference to economic activity. Accordingly, it sweeps too broadly.

Further, the statute does not require that Collette be engaged in the relevant market at the time of the regulated conduct. Chief Justice Roberts also noted that Congress cannot regulate a person's activity under the Commerce Clause unless the person affected is "currently engaged" in the relevant market. *NFIB*, 567 U.S. at 556, 557 (Roberts, C.J.). As an illustration, the Chief Justice provided the following example: "An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent sense." *Id.* at 556. As such, *NFIB* overrules the

long-standing notion that a firearm which has previously and remotely passed through interstate commerce should be considered to affect commerce indefinitely without "concern for when the [initial] nexus with commerce occurred." *Scarborough*, 431 U.S. at 577.

Collette's case illustrates how this Court's precedent removes any limitation on Congress' commerce power. His indictment alleged that he "possesse[ed]" two firearms that "ha[d] been shipped and transported in interstate commerce[.]" ROA.21. The sole evidence offered at trial to support the commerce element was testimony from an ATF agent that the firearms had been manufactured in Austria and Connecticut and had traveled interstate commerce to get to Texas. ROA.401–02. The Government offered no proof that Collette had traveled in interstate commerce to bring the firearms to Texas, nor even proof that Collette had purchased the firearms from any vendor participating in interstate commerce.

Collette thus was convicted under § 922(g)(1) without evidence that he was "currently engaged" in the gun market at the time of his arrest, and without evidence showing how recently he came to possess the gun. So § 922(g)(1) fails to survive *NFIB*'s Commerce Clause analysis. The statute has been construed to require only

that a firearm have traveled in interstate commerce at some previous time. *See Scarborough*, 431 U.S. at 575. If it cannot be construed to require commercial activity of some kind by the defendant—something more substantial than mere possession of an item that may have crossed state lines years ago—it then contains no jurisdictional element sufficient to bring it within the terms of Congressional power. In the absence of such a jurisdictional element, the Supreme Court has found federal criminal statutes falling substantially outside the Commerce power to be unconstitutional, without pausing to consider whether the particular conduct of the defendant might have affected commerce. *See Lopez*, 514 U.S. at 561; *United States v. Morrison*, 529 U.S. 598, 607 (2000). In other words, without such an element, comparable statutes have been found facially unconstitutional.

Collette concedes that this argument was rejected in *Alcantar*, 733 F.3d at 145–46, among other cases, but raises it to preserve the issue for possible further review.

## Conclusion

For these reasons, the Court should reverse the district court's denial of his motion to suppress and vacate his conviction.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Bradford W. Bogan
BRADFORD W. BOGAN
Assistant Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206-1205
(210) 472-6700
(210) 472-4454 (Fax)
*Attorney for Defendant-Appellant*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,686 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Bradford W. Bogan
BRADFORD W. BOGAN
*Attorney for Defendant-Appellant*
Dated: April 27, 2023