# No. 22-51062

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JEROSWASKI WAYNE COLLETTE,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

**Reply Brief of Defendant-Appellant**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

BRADFORD W. BOGAN
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

# Table of Contents

Table of Authorities...........................................................................ii

Arguments and Authorities ............................................................ 1

I. *Bruen* abrogated this Court's precedent concerning § 922(g)(1). ....................................................................... 1

II. Section 922(g)(1) facially violates the Second Amendment....... 4

    A. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1). ....................................................... 4

    B. The Government has not shown that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation. ............................................................... 6

        1. The Government appears to concede that there is no evidence felons were disarmed at the founding—*i.e.*, no "distinctly similar" laws. ............................................. 7

        2. Neither capital punishment nor forfeiture are historical analogues for § 922(g)(1). ............................... 8

        3. A purported tradition of disarming "dangerous" or "untrustworthy" people does not provide historical support for § 922(g)(1). ................................................ 15

III. Section 922(g)(1) violates the Second Amendment as applied to felons like Collette................................................... 22

Conclusion................................................................................... 25

Certificate of Compliance with Type-Volume Limit...................... 26

# Table of Authorities

## Cases

*District of Columbia v. Heller*,
　554 U.S. 570 (2008) .......................................................5, 6, 17, 18

*Furman v. Georgia*,
　408 U.S. 238 (1972) .................................................................. 10

*Harmelin v. Michigan*,
　501 U.S. 957 (1991) .................................................................. 10

*In re Bonvillian Marine Serv., Inc.*,
　19 F.4th 787 (5th Cir. 2011).................................................... 1, 2

*Jacobs v. Nat'l Drug Intel. Ctr.*,
　548 F.3d 375 (5th Cir. 2008) ......................................................... 1

*Kanter v. Barr*,
　919 F.3d 437 (7th Cir. 2019)...............................................*passim*

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
　142 S. Ct. 2111 (2022)...........................................................*passim*

*Range v. Att'y Gen.*,
　69 F.4th 96 (3d Cir. 2023) (en banc) ...................................*passim*

*United States v. Bullock*,
　No. 3:18-CR-165-CWR-FKB,
　2023 WL 4232309 (S.D. Miss. June 28, 2023) ...................*passim*

*United States v. Darrington*,
　351 F.3d 632 (5th Cir. 2003) .................................................... 1, 3

*United States v. Emerson*,
　270 F.3d 203 (5th Cir. 2001) ................................................ 1, 2, 3

*United States v. Hicks*,
　No. W:21-CR-60-ADA,
　2023 WL 164170 (W.D. Tex. Jan. 9, 2023) ........................... 17, 21

*United States v. McGinnis,*
  956 F.3d 747 (5th Cir. 2020) ................................................... 2, 3

*United States v. Rahimi,*
  61 F.4th 443 (5th Cir. 2023) ................................................*passim*

*United States v. Sitladeen,*
  64 F.4th 978 (8th Cir. 2023) ...................................................... 6

## Constitutional Provisions

U.S. Const. amend. II ................................................................ 5

## Statutes

18 U.S.C. § 922(g)(1) ...........................................................*passim*

18 U.S.C. § 922(g)(8) ....................................................... 2, 16, 19

Crimes Act,
  1 Cong. Ch. 9, 1 Stat. 112 (1790).................................................. 9

Militia Act of 1662......................................................................... 17

## Rules

Fed. R. App. P. 32(a)(5) ................................................................ 26

Fed. R. App. P. 32(a)(6) ................................................................ 26

Fed. R. App. P. 32(a)(7)(B) ........................................................... 26

Fed. R. App. P. 32(f) ................................................................... 26

## Other Authorities

Churchill, Robert H.,
  *Gun Regulation, the Police Power,*
  *and the Right to Keep Arms in Early America,*
  25 Law & Hist. Rev. 139 (2007)...................................... 17, 18, 21

Cooley, Thomas M.,
    A Treatise on the Constitutional Limitations Which
    Rest Upon the Legislative Power of the States
    of the American Union (1st ed. 1868) ........................................ 20

Greenlee, Joseph G. S.,
    *The Historical Justification for Prohibiting Dangerous Persons*
    *from Possessing Arms,*
    20 Wyo. L. Rev. 249 (2020) .................................................. 18, 21

Verrilli, Jr, Donald B.,
    *The Eighth Amendment and the*
    *Right to Bail: Historical Perspectives,*
    82 Colum. L. Rev. 328 (1982)...................................................... 11

## Arguments and Authorities

### I. *Bruen* abrogated this Court's precedent concerning § 922(g)(1).

The Government's lead argument is that this Court should not even conduct a *Bruen*[1] analysis but should consider itself bound by pre-*Bruen* Fifth Circuit case law upholding § 922(g)(1) against Second Amendment challenges. Gov't Br. 7–12 (citing *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003)). The Government is wrong. This Court has already held that *Bruen* abrogated *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), the sole case on which *Darrington* relied.

Under this Court's rule of orderliness, "one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." *In re Bonvillian Marine Svc., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). "The Supreme Court need not expressly overrule" this Court's precedent. *United States*

---

[1] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

*v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *petition for cert. granted*, No. 22-915 (U.S. June 30, 2023). Instead, "a latter panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law." *Bonvillian Marine*, 19 F.4th 792 (cleaned up). "One situation in which this may naturally occur is where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis." *Id.* (cleaned up). "When this occurs, the latter panel has both the authority and obligation to declare and implement the change in the law it perceives." *Id.* at 792 n.5 (cleaned up).

This has already happened with *Bruen* and this Court's earlier Second Amendment precedent. In *United States v. Rahimi*, this Court held that "*Bruen* clearly 'fundamentally changed' our analysis of laws that implicate the Second Amendment … rendering our prior precedent obsolete." 61 F.4th at 450–51 (cleaned up). *Rahimi* specifically identified *Emerson* as one of those obsolete cases, because it "determined—presumably by applying some form of means-end scrutiny sub silentio—that § 922(g)(8) was 'narrowly tailored' to the goal of minimizing 'the threat of lawless violence." *Id.* at 450 (cleaned up, quoting *United States v. McGinnis*, 956 F.3d 747, 755 (5th Cir. 2020)). Cases like *Emerson* are irreconcilable with

*Bruen*, the central holding of which is the repudiation of means-end scrutiny. *See Rahimi*, 61 F.4th at 450 (citing *Bruen*, 142 S. Ct. 2128–30).

Nevertheless, the Government claims that *Rahimi* limited its holding about obsolete caselaw to cases like *Emerson*, which applied means-end scrutiny, not to cases like *Darrington*, which the Government says relied exclusively on historical analysis. Gov't Br. 8–10. But *Darrington* did not conduct a historical analysis. It relied exclusively on *Emerson*. *See Darrington*, 351 F.3d at 633–34. And that reliance features a block quote from *Emerson* that contains the precise language identified as "means-end scrutiny sub silentio" in *Rahimi*. *Compare id.* (quoting *Emerson*, 270 F.3d at 261), *with Rahimi*, 61 F.4th at 450 (quoting *McGinnis*, 956 F.3d at 755). Indeed, the Government cites the very same "narrowly tailored" language that concerned the *Rahimi* court, and which is easily recognizable as means-end scrutiny. *See* Gov't Br. 8.

*Darrington*, like *Emerson* and other Second Amendment jurisprudence, is obsolete, and this Court must, as in *Rahimi*, conduct a *Bruen* analysis of Collette's challenge.

## II. Section 922(g)(1) facially violates the Second Amendment.

Under the *Bruen* framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2126. The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. If the Government cannot make that showing, then the regulation is unconstitutional. *Id*. The Government did not make that showing below, nor has it done so in this Court. For that reason, the Court should hold that § 922(g)(1) is unconstitutional.

### A. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1).

The Government argues, at *Bruen*'s first step, that Collette is not protected by the plain text of the Second Amendment because felons are not among "the people" protected by the Constitution. Gov't Br. 13–22. It posits that the Second Amendment only extends to "law-abiding, responsible citizens." *Id*. This argument short-circuits *Bruen*'s two-step framework by importing a historical analysis into the threshold question of whether the conduct at issue is covered by the plain text of the Second Amendment.

4

The only possible textual link in the Second Amendment to a person's status—as a felon or otherwise—is its reference to "the people." *See* U.S. Const. amend. II. The Supreme Court has already explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset" and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *District of Columbia v. Heller*, 554 U.S. 570, 580–81 (2008). "The people" protected by the Second Amendment are the same as those protected by the First, Fourth, and Ninth Amendments—all Americans. *Id.* at 570–80; *see* Collette Br. 17–21.

Consistent with *Heller*, *Rahimi* rejected the Government's efforts to impose a "law-abiding" gloss onto "the people" protected by the Second Amendment. *See Rahimi*, 61 F.4th at 451–53. *Rahimi* pointed out that the Government's argument is inconsistent with caselaw, lacks a limiting principle, and perverts basic constitutional principles. *See* 61 F.4th at 451–53. Insofar as *Rahimi* suggested in dicta that certain groups could be "exclude[d] from the Court's discussion," *Rahimi* was referring to *Bruen*'s second step, not its first

step—*i.e.*, a person's exclusion from the Constitutional right itself. *See United States v. Sitladeen*, 64 F.4th 978, 986 (8th Cir. 2023).

The Third Circuit agrees with *Rahimi* on this point. That court has held that felons are not excluded from the protections of the Second Amendment. *See Range v. Att'y Gen.*, 69 F.4th 96, 101–03 (3d Cir. 2023) (en banc). That view accords with then-Judge Barrett's view, endorsed by *Rahimi*, that a person's status as a felon does not exclude them from the protections of the Second Amendment but may speak to the historical power to nevertheless disarm them. *See Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barret, J., dissenting); *Rahimi*, 61 F.4th at 451–52.

At bottom, the Government is asking this Court to reject *Heller*, *Bruen*, *Rahimi* and the plain text of the Second Amendment. This the Court cannot do. Collette is not excluded from the protections of the Constitution merely because he is a felon. The plain text of the Second Amendment covers the conduct at issue in this case. *See* Collette Br. 15–16.

## B. The Government has not shown that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.

Because Collette's conduct is protected by the text of the Second Amendment, the Government bears the burden of showing that

§ 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. The Government has failed to meet its burden.

> **1. The Government appears to concede that there is no evidence felons were disarmed at the founding—*i.e.*, no "distinctly similar" laws.**

The Government does not identify any laws "distinctly similar" to § 922(g)(1)—laws specifically prohibiting felons from possessing firearms. Indeed, courts and scholars have uniformly recognized the absence of any such laws. *See* Collette Br. 32–37. While the Government here declines to explicitly acknowledge this fact, it has historically conceded it. *See United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *28–29 (S.D. Miss. June 28, 2023) (noting that historically the "U.S. Department of Justice formally advanced the position that early American history did not support felon disarmament"). Because § 922(g)(1) "addresses a general societal problem that has persisted since the 18th century," the lack of distinctly similar laws is "relevant evidence" that § 922(g)(1) violates the Second Amendment. *See Bruen*, 142 S. Ct. at 2131; *Rahimi*, 61 F.4th at 454.

7

**2. Neither capital punishment nor forfeiture are historical analogues for § 922(g)(1).**

The Government argues that § 922(g)(1) is analogous to historical laws allowing capital punishment and estate forfeiture for felony convictions. Gov't Br. 28–33. Its reliance on these purported traditions is misplaced. Neither capital punishment nor estate forfeiture are firearms regulations, so they are not properly considered under *Bruen*. *See* 142 S. Ct. at 2130 (Government has the burden to show the challenged regulation is "consistent with the Nation's historical tradition of *firearm* regulation" (emphasis added)). Indeed, every historical law *Bruen* considered was an explicit firearm regulation. *See id.* at 2138–53. The Government's argument seems to be that if the Government can punish somebody, it must be permitted to disarm them. That is not so. The Government also dramatically overstates the prevalence of capital punishment, in particular, to suggest that modern defendants like Collette would have simply been executed at the founding. That is not true.

### a. Capital punishment was not as prevalent as the Government claims at the founding and is not an analogue for § 922(g)(1)

The Government significantly overstates the availability of capital punishment at the founding. Although the Government suggests that capital crimes were ubiquitous at common law, it offers few actual statutes to support this position. *See* Gov't Br. 28–29. The First Congress, for example, which the Government cites, Gov't Br. 29, only recognized a select few felonies as capital. *See* Crimes Act, 1 Cong. Ch. 9, 1 Stat. 112 (1790). Those were treason, murder, certain piracy and maritime offenses, prison break for capital offenders, and counterfeiting. *Id*. Conversely, the Crimes Act enumerated far more crimes that were not capital, including: manslaughter, misprision of treason, accessory, interference with diplomatic immunity, passport obstruction, mayhem, perjury, obstruction, judicial bribery, and property crimes such as larceny. *Id*. The Government's historical evidence about capital punishment includes, only: the Crimes Act, which as discussed above enumerated far more non-capital crimes; a 1788 New York law which made certain felonies capital; and a 1743 Rhode Island law making counterfeiting bills of credit a capital offense. *See* Gov't Br. 29–31. Putting aside

that these laws discuss specific felonies and share virtually no features with § 922(g)(1), the Supreme Court has already explained that this amount of historical evidence is insufficient to establish a historical tradition under *Bruen*. *See* 142 S. Ct. at 2142 ("we doubt that *three* colonial regulations could suffice to show a tradition").

"Capital punishment was not as common a penalty in the American colonies" as in England, and the colonies recognized "far fewer" capital crimes. *See Furman v. Georgia*, 408 U.S. 238, 335 (1972) (Marshall, J., concurring). "[D]uring the period leading up to the founding, the connection between felonies and capital punishment started to fray." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). The colonies used the death penalty sparingly and, by the founding, states did not treat most felonies as capital. *Id.* New Hampshire, for example, explained in its constitution that "no wise legislature … will afix the same punishment to the crime of theft, forgery and the like, which they do to those of murder and treason[.]" *Harmelin v. Michigan*, 501 U.S. 957, 980 (1991) (opinion of Scalia, J.) (quoting N.H. Const., Pt. I, Art. XVIII (1784)). Massachusetts excluded crimes like arson, burglary, and robbery from its list of capital offenses, even as early as the 17th century. *See* Donald B. Verrilli, Jr.,

*The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 349 (1982). Thus, the Government is simply wrong to imply that the body of capital offenses from the founding serve as a comparable proxy for all felonies today. Assuredly, more crimes were capital at the founding than today. But most modern felonies that implicate § 922(g)(1) were not capital at the founding.

Even if this Court accepted the Government's faulty premise about the prevalence of capital punishment, it is not a "relevantly similar" historical analogue for § 922(g)(1). The Government ignores *Bruen*'s directive to compare challenged statutes to the historical tradition of firearm regulation. 142 S. Ct. at 2130. *Bruen* considered only firearm restrictions in its historical analysis, *id.* at 2138–53, and they were far more analogous to the challenged statute than those the Government offers here.[2] Indeed, the Government argues that capital punishment imposes a greater burden

_____

[2] *Bruen* rejected as historical analogues for the challenged may-issue licensing regime: English and colonial "going armed" and "going armed

than § 922(g)(1), but that is not what *Bruen* asks. *Bruen* directs courts to compare the burden placed "on the right of armed self-defense." 142 S. Ct. at 2133. Justice Barrett, when she was on the Seventh Circuit, pointed out the absurdity if the same reasoning were used to argue that felons lack a right to free speech because of the historical execution of some felons. *See Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting). Unlike living felons, deceased individuals do not have a right to armed self-defense

The en banc Third Circuit has also rejected analogizing § 922(g)(1) to historical capital punishment. *See Range*, 69 F.4th at 105. It explained:

> That Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not

---

offensively" laws, English proclamations decrying the proliferation of handguns, laws restricting concealed carry, surety statutes, and even a law forbidding public carry without reasonable grounds to fear an attack. 142 S. Ct. at 2138–53.

executed. As one of our dissenting colleagues notes, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society. … So the Government's attempt to disarm Range is not "relevantly similar" to earlier statutes allowing execution and forfeiture.

*Id.*; *see also Kanter*, 919 F.3d at 462 (Barrett, J., dissenting) ("The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society."). A district court in this Circuit recently followed suit. *See Bullock*, 2023 WL 4232309, at *23 ("For one, we don't know the direction of the causal chain. Does this history mean that persons with felony convictions can be disarmed because some were executed? Or does it mean that disarmament applies only to persons convicted of a death-eligible offense?"). The Government does not answer these questions; it simply insists that because some felons were historically executed, all felons can be permanently disarmed.

### b.  Estate forfeiture is not an analogue for § 922(g)(1).

The Government intersperses with its capital punishment argument a series of laws that permitted estate forfeiture as a punishment for specific crimes. Gov't Br. 28–33. It argues, in conjunction with the availability of capital punishment, that these laws support permanent disarmament of all felons. Not so.

13

The Government does not assert that asset forfeiture was a common punishment for all, or even most, crimes. Instead, it gathers laws from various colonies, over a 100-year period, most of which provided estate forfeiture as a specific penalty for specific crimes. In all, the Government cites forfeiture as a penalty in: a 1788 New York law penalizing several felonies; a 1777 Virginia forgery law; a 1700 Pennsylvania arson law; a 1705 Pennsylvania rape law; a 1715 Maryland embezzling law; a 1743 Rhode Island forgery and counterfeiting law; and a 1750 Massachusetts riot law. *See* Gov't Br. 29–32.

But these are not firearms laws, so they are not relevantly analogous to § 922(g)(1) under the *Bruen* framework. *See Bruen*, 142 S. Ct. at 2133. Indeed, the Government offers no explanation for how these laws meaningfully impacted a person's firearms rights. It does not even assert that firearms would be included in the estate to be forfeited, let alone that a person would be foreclosed from ever having a firearm again. Instead, as elsewhere, the Government's argument rests on the incorrect notion that courts compare general burdens between laws, rather than the specific burden on the firearm right. The en banc Third Circuit rejected this argument for the same reasons it rejected reliance on capital punishment. *See Range*,

69 F.4th at 105. *Range* even held that firearm forfeiture was an insufficient analogue because it was historically only available in some colonies, after conviction for a crime involving a firearm. *Id*.

Even more so than with capital punishment, the fact that an unrelated punishment was available for some small segment of those convicted of different crimes says nothing about the disarmament of all felons, let alone felons like Collette.

### 3. A purported tradition of disarming "dangerous" or "untrustworthy" people does not provide historical support for § 922(g)(1).

The Government also argues that an ill-defined history of disarming "dangerous or untrustworthy" people supports § 922(g)(1)'s constitutionality. Gov't Br. 33–41. The Government includes as support: (1) "going armed" laws; (2) laws disarming those who refused to swear allegiance; (3) rejected proposals during ratification debates to limit the Second Amendment; (4) laws disarming minorities; and (5) a general principle of disarming "unvirtuous citizens." Gov't Br. 33–41. The Government cobbles together these disparate restrictions together in an effort to manufacture a robust tradition of similar firearm regulation. But much of this evidence has already been rejected as ahistorical or dubious by this Court. *See Rahimi*, 61 F.4th at 456–61.

### a. "Going armed" laws.

The Government identifies a tradition in the colonies of prohibiting "going armed offensively." Gov't Br. 34. These laws are entirely dissimilar to § 922(g)(1) because they criminalize conduct, not categories of people. *See Bruen*, 142 S. Ct. at 2144–45 (rejecting comparison to these laws). This Court rejected reliance on these same laws in *Rahimi*. *See Rahimi*, 61 F.4th at 457–59. *Rahimi* not only concluded that "going armed" laws were insufficiently analogous to § 922(g)(8) (prohibiting firearm possession by those subject to domestic violence restraining orders), but it also found "doubtful" the notion that "these 'going armed' laws are reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of firearms." 61 F.4th at 458. As *Rahimi* explained, the cited laws did not include forfeiture provisions or removed their forfeiture provisions. *See id*. For similar reasons, they are not relevant analogues here.

### b. Laws disarming those who refused to swear allegiance.

The Government next relies on Revolution-era laws confiscating weapons from those who refused to swear an oath of allegiance. Gov't Br. 34–35. But the Government does not explain, except at the

highest levels of abstraction, how felons are analogous to political or religious dissidents.

More importantly, the Second Amendment was a *repudiation* of disarming political opponents. *See Heller*, 554 U.S. at 592–95, 598. The laws the Government cites here were not first adopted during the American Revolution; they had been imposed on colonial Americans who refused to swear allegiance to the English crown. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 157–61 (2007). Although the Government does not cite English laws like the Militia Act of 1662, it implicitly relies on this same English tradition of disarming political dissidents, which is not a "forerunner of our Nation's historical tradition of firearm regulation." *Rahimi*, 61 F.4th at 456. "Even 'traitors' unwilling to swear allegiance to the Crown retained their weapons in colonial America." *United States v. Hicks*, No. W:21-CR-60-ADA, 2023 WL 164170, at *5 (W.D. Tex. Jan. 9, 2023).

### c. **Proposals from ratification debates.**

The Government next argues that disarming select groups is consistent with proposals raised during ratification debates to limit

the right to peaceable citizens. Gov't Br. 35–36. This Court has already foreclosed reliance on these proposals because they did not become part of the Second Amendment. *See Rahimi*, 61 F.4th at 457; *see also Heller*, 554 U.S. at 603 (noting that it was "dubious" to rely on this history); *Kanter*, 919 F.3d at 454–56 (Barrett, J., dissenting); *Bullock*, 2023 WL 4232309, at *21–23.

### d. Laws disarming minorities or other categories of people the Government deems "dangerous" or "untrustworthy."

The Government next cites favorably to the founding-era disarming of "Native Americans" and "religious minorities" as evidence of a historical tradition of disarming "dangerous and untrustworthy" people. Gov't Br. 34–35. The Government could have added black people and indentured servants to the list, as laws disarming them are part of the same repugnant tradition. *See* Churchill at 156–58. The disarmament of unpopular communities is the most consistent species of categorical firearm regulation from the colonial era to the 19th century. *See* Greenlee at 269–70; Churchill at 156–58; *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

But the Government's reliance on these laws is misplaced. The Government does not explain how disarming political and social minorities is like disarming felons. *See Range*, 69 F.4th at 105 (*citing*

*Bruen*, 142 S. Ct. at 2134) (rejecting the analogy of these laws to § 922(g)(1) as "far too broad"). And the fact that disarming minorities is so plainly unconstitutional defeats its argument. *See Bruen*, 142 S. Ct. at 2131 (explaining that analogous regulations found to be unconstitutional is evidence of unconstitutionality), 2149 (rejecting reliance on surety laws enforced only pretextually against black Americans), 2150–51 (describing efforts to disarm freed slaves as violating their right to keep and bear arms).

This Court has also explained that the utility of these laws as "historical analogues is … dubious, at best," because these laws disarmed those who were excluded from "the people" protected by the Second Amendment altogether. *Rahimi*, 61 F.4th at 457. The laws were not just dissimilar to § 922(g)(8); the Court counseled against reliance on them at all.

Yet the Government presses on, relying on the purported 19th century disarmament of "vagrants," and those specifically convicted of "making an improper or dangerous use of weapons," as well as the ahistorical exclusion from gun rights of "the idiot, the lunatic, and the felon." Gov't Br. 36–37. Each argument fails.

The Government claims that Thomas Cooley's 1868 treatise explained that the "'idiot, the lunatic, and the felon'" were "'almost

universally excluded' from certain civic rights like gun rights …."
Gov't Br. 37 (citing Thomas M. Cooley, A Treatise on the Constitu-
tional Limitations Which Rest Upon the Legislative Power of the
States of the American Union 29 (1st ed. 1868)). However, the cited
passage says nothing about gun rights, but instead discusses the
elective franchise. *See* Cooley at 29. Insofar as the Government
would protest that "gun rights" are implicitly included in this type
of civic right, the Supreme Court has said the exact opposite in its
central holding in *Heller*. *See Kanter*, 919 F.3d at 463 (Barrett, J.,
dissenting) ("*Heller* … expressly rejects the argument that the Sec-
ond Amendment protects a purely civic right."). Indeed, Cooley else-
where specifically discussed the right to bear arms, and said noth-
ing about such widespread exclusions. *See* Cooley at 350.

Moreover, neither a "Reconstruction order applicable to South
Carolina" nor a single "circular" from the 1860s discussing specific
types of felons who could be disarmed, *see* Gov't Br. 36–37, establish
a historical tradition. Indeed, the Government seems to have copied
these citations from *Bruen*'s discussion of odious post-war Black
Codes, despite *Bruen* itself giving no indication that it credited
them as historical evidence. *See Bruen*, 142 S. Ct. at 2152. Instead,

*Bruen* specifically noted that these types of prohibitions were discriminatorily enforced against blacks. *See id.* at 2152 n.27. The Government also offers absolutely no explanation for how this evidence is "relevantly similar" to § 922(g)(1). And perhaps most tellingly, these laws are from the 19th century, and have no bearing on the founding-era understanding of the right as it related to a federal law. *See Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring).

### e.  Disarmament of "unvirtuous citizens."

Finally, the Government argues that scholars broadly agree that the right to bear arms has historically been tied to the concept of "virtuous citizenry," which the Government reasons excludes felons. Gov't Br. 37–38. But this "virtuous citizen" theory lacks historical support. *See* Greenlee at 275–83. The earliest articles promoting the theory fail to cite to any historical evidence. *See id*. In fact, historical categorical disarmament was generally limited to disempowered minority communities—like slaves and Native Americans—and those who evidenced disloyalty to the government. *See* Greenlee at 261–65; Churchill at 156–61. One court has already explained the historical abuses and obvious dangers in relying on this virtuous citizen theory. *See Hicks*, 2023 WL 164170, at *6 (explaining

how the theory has been used to disarm minorities and could similarly be abused today); *see also Bullock*, 2023 WL 4232309, at *23–25 (rejecting reliance on this theory).

These restrictions are not only troubling, but they also provide no relevant analogue to felons. Indeed, the Government's reliance on such an amorphous categorization seems to invite the kind of deference to legislatures that *Bruen* expressly rejected. *See* 142 S. Ct. at 2131.

* * *

Because the Government has failed to identify any "distinctly similar" or "relevantly similar" laws from the founding that demonstrate a broad tradition of firearms restrictions like § 922(g)(1), it has failed to meet its burden under *Bruen*. This Court should therefore hold that § 922(g)(1) facially violates the Second Amendment.

## III. Section 922(g)(1) violates the Second Amendment as applied to felons like Collette.

The Government argues that § 922(g)(1) is at least constitutional as applied to "dangerous criminals" like Collette. Gov't Br. 41–45. This argument also rests on the same faulty premise under-

lying the Government's arguments about the facial constitutionality of § 922(g)(1): that dangerous people could historically be disarmed.

As discussed above, there is no historical evidence to support the proposition that felons, dangerous or otherwise, were disarmed at the founding. *See Bullock*, 2023 WL 4232309, at *31 ("The government's violent-and-dangerous argument is also out of sequence, as the government still had not (and has not today) proven the predicate question: that there is a historical tradition of disarming either the violent or the dangerous."). Courts are skeptical of subjecting § 922(g)(1) challenges to this type of ambiguous and unworkable dangerousness test. *See, e.g., id.* at *28; *Range*, 69 F.4th at 104 n.9 ("We need not decide [whether dangerousness or violence is the touchstone] today because the Government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not.").

In an as-applied *Bruen* challenge, as in a facial challenge, the Government must show that felons like Collette were historically disarmed. *See Range*, 69 F.4th at 106 ("Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms,

§ 922(g)(1) cannot constitutionally strip him of his Second Amend-ment rights."). The Government has not cited a single statute in support of that position.

In the end, the Government's as-applied argument is nothing more than a policy argument. But *Bruen* requires more. It requires evidence of a historical tradition of disarming those convicted of the same crimes as Collette. Because the Government has failed to do so, the Court should hold § 922(g)(1) unconstitutional as applied to Collette.

## Conclusion

For these reasons, and those in Collette's opening brief, the Court should reverse the district court's denial of his motion to dismiss the indictment and vacate his conviction.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Bradford W. Bogan
BRADFORD W. BOGAN
Assistant Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206-1205
(210) 472-6700
(210) 472-4454 (Fax)
*Attorney for Defendant-Appellant*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,653 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Bradford W. Bogan

BRADFORD W. BOGAN

*Attorney for Defendant-Appellant*

Dated: July 21, 2023
